## Case No. 4,283.

### The EDITH.

[11 Blatchf. 451.] [1]

Circuit Court, S. D. New York. Feb. 19, 1874. [2]

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

[2] [Affirming Case No. 4,282. Decree of circuit court affirmed by supreme court in 94 U. S. 518.]

Charles Donohue, for Poole and others.
Everett P. Wheeler, for Tyler.

WOODRUFF, Circuit Judge. The ship Edith was heretofore sold under and by virtue of a decree of the district court in admiralty, and, after satisfying from the proceeds certain claims of the libellants and their costs, &c., there remained in the registry of the court the sum of $31,176 82, subject to distribution among claimants. The appellants, D. Freeman Poole and others, thereupon presented their petition, alleging that they, as shipwrights, had made repairs upon said ship and furnished materials; and, claiming that they had a lien upon the ship therefor, they asked that their said claim be paid out of such proceeds. Their petition and claim were resisted by Daniel Tyler, a mortgagee of three fourth parts of the ship, to whom was due a sum which, after the payment of another mortgage on one-half of the vessel, exceeded the residue of such surplus proceeds, and by John Sedgwick, the assignee in bankruptcy of Charles Carow, the owner of the ship. There was some controversy between Tyler and the said assignee, as to their relative rights; but the decision of the court thereupon is not appealed from by either of them, and need not be further noticed. The court held and decided—The Edith [Case No. 4,282]—that the petitioners, Poole and others, had no lien upon the ship, nor, as between them and the mortgagee and the assignee in bankruptcy, any title to such surplus; and it was therefore decreed, that such surplus, after paying such mortgage on one-half, be divided between the said mortgagee Tyler and such assignee in proportions deemed to be according to their respective rights as be-

tween themselves. The petitioners, Poole and others, being thus excluded from any share in said surplus, have appealed to this court.

The ship Edith was a domestic vessel. Her owner resided in the city of New York. The repairs in question were done by the petitioners, and the materials therefor were furnished to the ship, while she was lying in navigable waters in the port of New York, by order of her master and her owner, in the month of July, 1870. The petitioners, in their petition, set up no other ground of claim; but, in the proofs that were taken, it appeared that the petitioners, after the repairs were made, attempted to claim and enforce a lien therefor under a statute of the state of New York, in pursuance of which they caused an attachment to be issued to the sheriff of the city and county of New York, who, by virtue thereof, seized the ship. Thereupon a "satisfactory" bond was given by or on behalf of her owner, as permitted by that statute, and the ship was discharged from custody and from the said attachment. An action was then brought upon the said bond, which is now pending and undetermined in the state court.

I. Independent of the technical objection, that the petitioners did not come to the court alleging in their petition any lien upon the ship acquired under the statute of the state of New York, their proceedings to enforce a lien under the state law will not avail anything in this case against the claim of the mortgagee.

1st. The cases of In re Josephine, 39 N. Y. 19, and Brookman v. Hamill, 43 N. Y. 554, under the authority of The Moses Taylor, 4 Wall. [71 U. S.] 411, and The Hine v. Trevor, Id. 555, must be regarded as settling, for the present, at least, that the statute of New York in question (Acts Leg. N. Y. 1862, c. 482, p. 956), so far as it attempts to give a remedy for the enforcement of maritime contracts, which is not according to the course of the common law, is unconstitutional and void, and that the remedy given by that statute is not a common law remedy.

2d. It is claimed that those decisions should be confined to the mere proposition, that the manner of enforcing the lien therein attempted to be given is unconstitutional and void, but that the lien given by the statute is, nevertheless, a valid lien. Neither the language of the cases nor other reasons warrant any such distinction. The grounds of those decisions forbid it. The lien which is to be created under the New York statute and the manner of enforcing it cannot be thus separated. The statute was an attempt (so far as maritime contracts were embraced therein) to take jurisdiction from the courts of admiralty, and prescribe a new incident to such contracts, and enforce the right conferred by a proceeding strictly in rem. If, by the rules and principles of maritime law, as administered in courts of admiralty, and governing

its jurisdiction and the exercise thereof, a lien already existed in virtue of the contract, then, separate and distinct from the provisions of the statute for enforcing it, which are thus conceded to be void, the supposed lien obtains no force or validity from the statute. In that respect, the statute is an idle and useless declaration. If, by the rules and principles governing courts of admiralty, no such lien exists, then the attempt to control the courts of admiralty, and so interfere with their administration, by attempting to create new maritime liens not known or recognized in those courts, and which affect the rights of parties there who rely upon the law maritime in their dealings, may be deemed liable to all the objections which induced the decisions to which I have referred. If the lien exists as the creature of the state law, how is it to be executed? Strike out the mode of proceeding for its enforcement prescribed by the statute, and there is no common law mode provided by which the state courts can give it any efficacy. And the moment it is sought to enforce it as a lien in the court of admiralty, it proceeds upon the idea that the states can give to those courts jurisdiction not known or pertaining to them under the constitution and laws of the United States, or, at least, can introduce into those courts new rules of decision, and establish priorities not known to the maritime law—priorities. which, as against persons who may have other and recognized maritime liens, would be in direct conflict with the maritime law.

In its bearing upon this point, the dissenting opinion of Chief Justice Taney, in Taylor v. Carryl, 20 How. [61 U. S.] 600, concurred in by Justices Wayne, Grier and Clifford, is very significant. Though not deemed by the majority of the court to meet the grounds on which their opinion was placed in that particular case, it is an able and convincing maintenance of the courts of admiralty and the admiralty law, against any modification of their authority or rules of decision by the states.

The consideration of this case will, therefore, raise the question, whether the petitioners had a lien upon the ship by the maritime law; and the conclusion on that subject is that they had not, as will be herein more fully stated. But, it is equally clear, that the contract for repairs and materials is a maritime contract, of which courts of admiralty have jurisdiction. The question whether the states can, by statute, annex to a maritime contract any lien on the vessel not known to the maritime law, and whether the court of admiralty ought to recognize and enforce it, has been very much discussed, as will hereafter be seen. The language used by Mr. Justice Clifford in The Belfast, 7 Wall. [74 U. S.] 645, and repeated in Leon v. Galceran, 11 Wall. [78 U. S.] 185, 192, imports that, although the contract be maritime, yet, if there be no lien incident thereto by the maritime law, the states may, by statute,

give a lien, if their legislation do not amount to a regulation of commerce, and they may provide for enforcing such lien. The case last named may be deemed to illustrate this. There the claim was for wages of mariners. It was founded on not only a maritime contract, but, by the law maritime, a contract out of which arose a lien on the vessel. The supreme court nevertheless sustained a suit in personam, in the state court, under the laws of Louisiana, in which writs called "writs of sequestration" were issued and levied on the vessel, as a security to respond to the judgment which the plaintiff might recover against the owner of the vessel, as defendant in the suit. The court say, that the mariners had a right to proceed in personam, in the state court, against the owner, and that such a writ, when duly issued and served in such a case, has substantially the same effect, in the practice of the courts of that state, as an attachment on mesne process, in jurisdictions where a creditor is authorized to employ such a process to create a lien upon the property of his debtor, as a security to respond to his judgment; and the right to obtain a lien by foreign attachment under the state law, not as a maritime proceeding in rem, but as a means of obtaining security for the debt and enforcing its payment, seems to lie at the foundation of the opinion of the majority of the court in Taylor v. Carryl [supra], above adverted to. This furnishes no warrant for sustaining the lien alleged to have been given by the law of the state of New York, the only mode of enforcing which, and the only right given by the statute to enforce it at all, is a proceeding strictly in rem and not in personam; and that is void, under the decisions in the cases of The Moses Taylor and The Hine v. Trevor, above cited. See, on this point, the cases of In re Josephine, 39 N. Y. 19, and Brookman v. Hamill, 43 N. Y. 554. That, in a suit in personam, property of the debtor may be attached under state laws, and held to satisfy the judgment which may be recovered, whether the property be a ship, or property in any other form, may not be doubtful,—Taylor v. Carryl [supra]; Leon v. Galceran [supra]; and, that courts of admiralty, where the rules regulating process allow it, may authorize process in rem for the same purpose, will be suggested in considering the meaning and effect of the recent rule of the supreme court, hereinafter mentioned.

But, it may well be doubted, that the supreme court or Mr. Justice Clifford meant to be understood to hold that a state may annex to a maritime contract, or even to any contract relating to a ship, a lien which shall operate to withdraw her in any degree from the operation and effect of the law maritime, by which courts of admiralty are governed, and which, by the constitution, they are authorized and are bound to administer, or which shall hinder or prevent courts of admiralty from dealing with the ship in all

respects according to the principles of the admiralty law. Can the states, by their statutes, create liens which shall interfere with or disturb the priorities given by the law maritime? If they can, then power to maintain and administer the jurisdiction and laws of the admiralty has not been conferred upon the government of the United States and its courts. For illustration, suppose a case of collision, and a suit against the ship to recover therefor, in the admiralty. Can the states create liens, upon which any party may intervene by cross libel or otherwise, and assert a priority over the maritime lien, and take, as the case may be, the whole value of the vessel? Such state liens may, perhaps, be good as against the owner, who was bound by the contract; and liens may arise, in suits in personam, by attachment or like process, but they must be held subject to the maritime law; and seizures on such attachments may operate on the vessel in the condition in which she is found, and hold her, subject to all prior liens, as security for the judgment which may be recovered.

3d. But, independent of the suggestions already made, the statute itself under which the petitioners attempted to obtain a lien, is fatal to any maintenance of that lien as the creation of that statute. The attachment which the statute authorized having been issued, and the vessel seized, a "satisfactory bond was given, under the state law. The vessel thereupon was discharged from the custody of the sheriff and from the attachment." This is the language of the proof. The bond, here referred to, and prescribed by the statute, is conditioned for the payment "of any and all claims and demands which shall be established to be due to the person or persons in whose behalf such warrant was issued, and to have been a subsisting lien upon such vessel pursuant to the provisions of this act," &c., &c.; and the 12th section declares, that, upon the giving of such bond, the officer issuing the attachment shall discharge the same, and that thereafter "no further proceedings against the said vessel so seized shall be had under the provisions of this title, founded upon any demand secured by such bond;" and, by sections 28 and 29, it is provided, that, where the creditor has taken the preliminary steps to acquire a lien, the owner need not wait until the vessel has been seized. He may apply to the officer, and give such bond, and the officer shall direct that the said lien be marked by the clerk as discharged, "and the same shall cease to be a lien upon such vessel." The statute itself, therefore, makes the giving of bond for the payment of the claim terminate the lien. The bond becomes the substitute for the vessel. This, in my opinion, ends the question of lien under or by virtue of the state law. The petitioners, setting up and claiming under this statute, must accept its provisions, with all their necessary con-

sequences; and, when the owners of the Edith gave the statute bond for the discharge of the ship, there was an end to their lien under the state law. It does not affect this result, that the bond would be held void, as part of the remedy, under the decisions above cited. The only lien the petitioners obtained, by virtue of the statute, was subject to be defeated by the giving of the bond, and it was thereby defeated. The most that can be said of the decisions declaring the bond void is, that the whole statute, viz.: the attempted creation of the lien, the attachment for its enforcement, the giving of the bond, and the remedy thereon, are all so connected, under the statute, that they all fall together under the one condemnation.

4th. This result is still more apparent when the limitations inserted in the New York statute are adverted to. They make it plain that it was not the intent of that statute to create a lien upon the vessel independent of the prescribed mode of its enforcement. The statute did not declare a lien, to be a continuing lien, and to be availed of in any mode known to the common law. The precise steps to make the declared lien available, and the only mode of making it effective, are pointed out; and it is expressly declared that the debt shall cease to be a lien at the expiration of six months after the debt was contracted, unless at that time the ship or vessel shall be absent from the port at which such debt was contracted, in which case the said lien shall continue until the expiration of ten days after such ship or vessel shall return to said port. The proceeding is in all respects summary. Within the period thus limited, a warrant must be issued for the seizure of the vessel; advertisement must be made for other claims; after thirty days, if the owner do not obtain a discharge of the vessel by giving bond, the vessel must be sold, and the proceeds distributed among those who have presented claims. This shows the nature of the right called a lien. It is inextricably connected with the means provided for its enforcement; and, they being void, it has no longer anything of value or force. And it is especially clear, that, after the lapse of six months, or of the further term of ten days, what is called the lien ceases. As a lien, it has operated to hold the vessel for that period, subject to be taken under the warrant. Then it has performed its whole office, and, by the very words of the statute, it ceases. After that, the vessel, if it be held at all, is held, not by virtue of a continuing lien, but by virtue of process and seizure whereby it becomes a security for the payment of claims which may be presented. The process and seizure and authority to sell being adjudged void, nothing remains to the creditor, either of lien or security. No one would, I think, claim that, where no warrant was issued for the seizure and sale of the vessel, the lien continued beyond the pe-

riod expressly limited. If not, then a void proceeding provided for by statute is no better than taking no proceeding, and the lien of the creditor is equally at an end. He stands a general creditor of the owner, and that is all. In the case now under consideration, this limitation is fatal to the petitioners' endeavor to maintain a lien under the law of the state of New York.

II. The next, and, in view of the pendency of other cases relating to the subject, the most important question, is, whether the petitioner had a lien independent of the statute of the state of New York; or, in another form, has one who makes repairs and furnishes materials to a domestic vessel in her home port, and in the port of the residence of her owner, a maritime lien upon the vessel?

In view of the course of decision in the supreme court of the United States upon that question, I do not feel at liberty, in this court, to inquire whether, in such case, a lien was given by the civil law. If the supreme court should feel at liberty to recall the decisions heretofore made therein upon the question, and treat the subject as open to inquiry and determination, according to the rules of the civil law, they will do so. This court is bound by the decisions of the supreme court as they now stand. It will, therefore, be sufficient for the purposes of this case, and it is all that I feel at liberty to do, to state the course of decision in that tribunal. It may, however, tend to a better and more clear understanding of their result, if I suggest that they recognize a distinction between the requisites to maritime or admiralty jurisdiction, and the requisites to a maritime lien. That is to say, that the courts of admiralty have jurisdiction of all maritime contracts and maritime torts, but that it does not follow that, in all cases of jurisdiction of the contract or subject-matter, founded on its nature, as maritime, there is also a lien upon the ship or vessel. The recognition of such a distinction by the supreme court is important in considering the meaning and inference to be assigned to the decisions and opinions which hold the contract for supplies and materials to a vessel, though in her home port, a maritime contract, of which the courts of admiralty have jurisdiction. The inquiry, therefore, is, in each case—does the contract and its performance create a maritime lien, according to the course of decision in the supreme court?

The supreme court, in 1819, in The General Smith, 4 Wheat. [17 U. S.] 438, recognizes the distinction above adverted to; and, while it is, in the opinion of the court, given by Mr. Justice Story, distinctly stated, that no doubt is entertained of the jurisdiction of the admiralty in cases of material men, it is with unqualified distinctness held, in respect to repairs and necessaries in the port or state to which the ship belongs, that the law maritime gives or implies no lien.

In The St. Jago de Cuba (in 1824) 9 Wheat. [22 U. S.] 409, the court sustained the claim of those who had furnished materials and supplies, to a lien on the vessel. But the doctrine of The General Smith is affirmed, and additional reasons given therefor. The decision is expressly placed on the ground that the owners, by their conduct, were estopped to allege that she was a domestic vessel, being "thus precluded, by their own act, from denying her foreign character."

In 1833, the court, in Peyroux v. Howard, 7 Pet. [32 U. S.] 324, reassert the doctrine of The General Smith in the very terms of the opinion in that case. On the subject of the jurisdiction of the admiralty over our navigable rivers, subsequent cases correct the observations made in the opinion which assume that it is limited to the ebb and flow of the tide; but that has no bearing on the subject now under consideration.

In 1848, Judge Nelson, giving the opinion in New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. [47 U. S.] 344, reasserts the doctrine, that there is no maritime lien in favor of material men in the home port, as held in The General Smith; and it may be worthy of notice that the question chiefly discussed, and on which the supreme court were divided, was, whether the jurisdiction of the admiralty was even as comprehensive as was assumed in that case.

In 1857, in People's Ferry Co. v. Beers, 20 How. [61 U. S.] 393, in giving the opinion of the court, that the ship-builder had no maritime lien, Mr. Justice Catron strongly reaffirms, of repairs and materials, that, "where the owner is present, no lien is acquired by the material man, nor is any where the vessel is supplied or repaired in the home port."

It is, perhaps, necessary to the full history of the subject to state, that, while the existence of a maritime lien for materials and supplies in the home port had been thus frequently denied, the right of the material man to proceed in the admiralty in rem, where the state law gave him a lien therefor, had been distinctly allowed by the 12th rule in admiralty, adopted in 1844. In the cases above mentioned, the power to employ the process of the admiralty to enforce such liens was admitted. In the inferior courts, the right had been recognized, and the lien created by the state law sustained. The distinction between cases in which the cause of action was itself within the admiralty jurisdiction, and the cases in which the admiralty had, independent of the local law, no jurisdiction, may not always have been attended to. But where, as in case of repairs and supplies to a vessel even in the home port, the contract was itself deemed maritime in its nature, and so within the admiralty jurisdiction, notwithstanding the absence of a maritime lien, it was not deemed beyond the power of the admiralty, having acquired jurisdiction by the nature of the contract, to recognize one of the incidents

of the contract, although created by the local law, and, in administering upon the subject-matter, to give effect to the lien so created.

Thus, in The General Smith, Judge Story says, that no lien is implied unless it is recognized by the municipal law of the state.

Mr. Justice Thompson, in Peyroux v. Howard, of the particular contract relied on in that case, says: "It is a maritime contract; and, if the service was to be performed in a place within the jurisdiction of the admiralty, and the lien given by the local law, * * * it will bring the case within the jurisdiction of the court."

In The Orleans v. Phoebus, 11 Pet. [36 U. S.] 175, Mr. Justice Story limits the apparent meaning of the observation last cited, stating that the local laws could not confer jurisdiction upon the admiralty, and that they could only furnish rules to ascertain the rights of parties, and thus assist in the administration of the proper remedies, where the jurisdiction is vested by the laws of the United States. Hence, in the case then before the court, the cause of action not being of maritime jurisdiction, the existence of a lien by the state law would not avail the libellants.

So also, Mr. Justice Nelson, in New Jersey Steam Nav. Co. v. Merchants' Bank [6 How. (47 U. S.) 344], at page 390, apparently overlooking, or, at least, not noticing the distinction stated by Judge Story, states that jurisdiction has always been exercised by the admiralty courts in this country, in suits by ship carpenters and material men, for repairs and necessaries made and furnished to ships, whether foreign, or in the home port, if the municipal laws of the state give a lien for the work and materials; and he cites numerous cases from the district and circuit and supreme courts.

Mr. Justice Catron, however, in giving the opinion in People's Ferry Co. v. Beers [supra], noticing the fact that district courts have recognized the existence of admiralty jurisdiction in rem against a vessel to enforce a carpenter's bill for work and materials furnished in constructing it, in cases where a lien had been created by the local law,—e. g., Read v. Hull of a New Brig [Case No. 11,609]; Davis v. New Brig [Id. 3,643]; Harper v. New Brig [Id. 6,090]; Ludington v. The Nucleus [Id. 8,598],—adds: "Thus far, however, in our judicial history, no case of the kind has been sanctioned by this court." This, it will be observed, was said of a case of the building of a vessel, which the court held was not a case within the jurisdiction of the admiralty, that the jurisdiction depended upon the nature of the contract, and that a contract for the building of a vessel is not maritime.

After this decision, and, as explained in the opinion of the court in Maguire v. Card, 21 How. [62 U. S.] 251, "so as to take from the district courts the right of proceeding in rem against a domestic vessel for supplies and repairs, which had been assumed upon the authority of a lien given by state laws, it being conceded that no such lien existed according to the admiralty law," the supreme court, by the amended 12th rule, to take effect May 1st, 1859, provided for proceedings in rem or in personam, in suits by material men for repairs or supplies to a foreign vessel; and for proceedings in personam but not in rem, in cases of domestic ships, for supplies, repairs, or other necessaries."

By the course of decision down to that time, above referred to, the supreme court affirmed, that the contract for repairs and supplies to a vessel is a maritime contract, and within the jurisdiction of the district courts, as courts of admiralty; that the contract for supplies and repairs to a foreign vessel is attended by a maritime lien in favor of the material man or repairer, as an incident to the contract which would be enforced in the admiralty; that the contract for supplies and repairs to a domestic vessel in her home port is attended by no such incident; that no maritime lien is implied therein or created thereby; and that, although the admiralty had jurisdiction of the contract, and would sustain suits thereon in personam, there is no lien by maritime law upon the vessel itself, to be enforced as such; and, finally, the rule last referred to affirms, that such last named contract is a maritime contract of which the admiralty has jurisdiction, but that it creates no maritime lien upon the vessel, and the courts are forbidden to proceed in rem to enforce liens claimed in such case under state laws.

The case of Maguire v. Card [supra], decided in 1858, at the same term at which the rule was adopted, was distinctly in point. The supplies for which a libel in rem was filed were furnished to a domestic vessel engaged in navigating the Sacramento river, and lying in the port of Sacramento. The court, in that case, wholly denied the jurisdiction of the admiralty of the subject-matter, in any form or under any process, because the vessel was engaged in the purely internal commerce of the state. This ground of the decision has since then been overruled. The Belfast, 7 Wall. [74 U. S.] 624. But the court explain the rule then recently adopted, and declare a determination to leave liens asserted under state laws to be enforced by the state courts. The language of the opinion is very broad; and yet, as it was used in a case in which the court disclaimed any jurisdiction of the contract, it may be doubted that the court intended to hold that, where, upon other grounds, the admiralty has jurisdiction to arrest and sell a vessel in a proceeding in rem, it will not recognize the existence of a lien created by state laws, in the adjustment of the rights of parties intervening for their interest.

That the local laws could not confer jurisdiction upon our courts of admiralty was

again affirmed in Roach v. Chapman (in 1859) 22 How. [63 U. S.] 129.

In 1861, in the case of The St. Lawrence, 1 Black [66 U. S.] 522, the subject was fully reviewed by Chief Justice Taney. He gives the reason for the former rule of 1844, and for its abrogation in 1859, and recognizes the distinction between the cases in which the admiralty has no jurisdiction of the subject-matter, and can acquire none by virtue of the local or state laws, and those in which, having jurisdiction of the contract, as maritime, it has recognized the lien upon the vessel which the state laws created. He places the authority to make and change the rules referred to, not upon the principles of admiralty law, conclusively determining by what process its jurisdiction should be exercised in any particular case, but on the authority conferred by statute on the supreme court, in its discretion, to prescribe the process and modes of proceeding, where jurisdiction does exist. Thereupon, holding that the rule of 1859 was prospective only in its operation, the court hold the libellant entitled to the benefit of the proceeding he had taken before that rule was adopted; and, the contract for supplies being maritime and within the jurisdiction of the court, hold, also, that a decree condemning the vessel should be affirmed.

The cases of The Moses Taylor, 4 Wall. [71 U. S.] 411, and The Hine v. Trevor, Id. 555, decided in 1866, are important to the question whether and to what extent state laws purporting to create liens, in cases embraced in the jurisdiction of the admiralty, and to provide a proceeding in rem for their enforcement, have any validity whatever. But, on the single question, whether there exists a maritime lien for repairs and supplies to a domestic vessel in her home port, they make no change in the course of decision already recited.

In 1868, in the case of The Belfast [supra], in which the court overrule prior decisions restricting the jurisdiction of the admiralty to tide waters, the court reaffirm the decisions last above mentioned; and, in the opinion, Mr. Justice Clifford says: "State legislatures have no authority to create a maritime lien; nor can they confer any jurisdiction upon a state court to enforce such a lien by a suit or proceeding in rem, as practiced in the admiralty courts." It will be seen, that, as above stated, the court had already held that the states could confer no jurisdiction of any kind upon the United States courts. Again, he says: "Such" (a maritime) "lien does not arise in a contract for materials and supplies furnished to a vessel in her home port;" and again: "Contracts for ship-building are held not to be maritime contracts," and, "in all cases where a maritime lien arises, the original jurisdiction to enforce the same by a proceeding in rem is exclusively in the district courts of the United States." He expresses the opinion, however, that, in reference both to contracts not maritime and to contracts out of which, although maritime, no lien arises, it is competent for the states, under the decisions of the supreme court, to create such liens as their legislatures may deem just and expedient, not amounting to a regulation of commerce, and to enact reasonable rules and regulations prescribing the mode of their enforcement.

In 1869, in the case of The Kalorama, 10 Wall. [77 U. S.] at page 211, Mr. Justice Clifford, again adverting to the proposition that no maritime lien arises for supplies furnished in the home port, declares that the supreme court have put the doubt once existing on that subject at rest.

In 1870, in the case of Leon v. Galceran [supra], the meaning and effect of the decisions in The Moses Taylor and The Hine v. Trevor, above referred to, are considered; and the opinion delivered in The Belfast is affirmed and applied, where the action was brought in personam, in a state court, by mariners having a maritime lien for wages, and having, also, by the state law, a right, in the nature of a lien, to have the vessel seized by writ of sequestration, to be held as security for the judgments which they might recover in such action. The legality of such a proceeding was affirmed; but the opinion reiterates, as in The Belfast, that a maritime lien does not arise in a contract for materials and supplies furnished to a vessel in her home port.

In the face of this continuous declaration of the supreme court, that no maritime lien exists in a case like the one under consideration, in effect, that the libellants had no lien upon the ship Edith for repairs and materials done and furnished in her home port, I am asked to declare that such maritime lien does exist, and to decree to the libellants a portion of the proceeds of her sale, to the exclusion of mortgagees and the assignee in bankruptcy of her owner. Having arrived at the conclusion that the libellants are not so entitled by virtue of the provisions of the state statute, their claim must rest solely upon their alleged maritime lien. On the questions, what was the rule of the civil law, and what should be the influence of authorities cited thereon, or of the early authorities, cited by counsel, showing the recognition of the rule of the civil law in this country, I am not called upon to express an opinion. If I deemed the course of decision which I have collated to have originated in misapprehension, and to be erroneous, it would neither be decorous nor proper for me so to hold. I am aware that many and very important limitations of the jurisdiction of our courts of admiralty, declared in former decisions of the supreme court, have, within a few years past, been held by the same court erroneous, and the cases containing them overruled. Both as to waters over which jurisdiction is to be asserted, and as to contracts and torts once

deemed not to be of admiralty cognizance, the court now asserts and exercises jurisdiction. Possibly, the court is now ready to affirm the existence of a maritime lien in the case under consideration. But it is for the supreme court itself, and not for the circuit court, to assume to disregard the decisions of the former tribunal heretofore made on the subject.

III. It is suggested, that the supreme court has acted in this matter, and, by a more recent rule, has practically overruled all the denials that material men have a maritime lien on the vessel, which are found in the previous decisions.

On the 6th of May, 1872, the court ordered that the twelfth rule in admiralty, above adverted to, be amended so as to read as follows: "In all suits by material men for supplies or repairs, or other necessaries, the libellant may proceed against the ship and freight in rem, or against the master or owner alone in personam." I am furnished with some decisions in the district courts which are claimed to hold that, by force of this rule, they are bound to hold that the decisions of the supreme court in the past are now overruled, and that contracts for supplies do now create a maritime lien. The rule has no such necessary interpretation, and I think it becomes this court, before acting upon it as authority for so holding, to await some more decisive declaration from the supreme court.

1. In The St. Lawrence, ubi supra, the supreme court state the foundation of their authority to make the rule of 1859 (now amended), and they define its scope and meaning. Their rules are not made for the purpose of changing the law. The jurisdiction and powers of courts of admiralty in this country are declared in the constitution, and vested in the courts which possess and exercise them, by the acts of congress. The supreme court does not assume to change the law. Their rules are rules of practice. They are made and altered, as the court in its discretion sees fit, under acts of congress empowering that court, from time to time, to prescribe and regulate and alter the forms of writs and other process to be used in the district and circuit courts of the United States, and the forms and modes of framing. and filing libels and other proceedings in admiralty, and making the forms and modes of proceeding according to the principles, rules and usages of courts of admiralty, subject to such alterations and additions as the courts deem expedient, or to such regulations as the supreme court shall think proper, by rule, to prescribe. The supreme court does not assume to vest new rights not before recognized by the maritime law. It does regulate the practice by which rights vested by law may be prosecuted and maintained, and by which wrongs may be redressed. It acts in reference to the remedy, the means of enforcing rights, or of obtaining redress for their violation. This is, in substance, the exposition given by the supreme court itself, as a vindication of the former rule, in the case last referred to. The court, therefore, does not, by force of its rule, create a maritime lien, where, by the law maritime, none exists. It may assume to furnish a means of obtaining a lien, as a security for the judgment which may be rendered by the court. That is in analogy to all seizures and attachments wherein a lien or right to hold the subject seized, to secure the judgment which the court may pronounce, is gained by service of the process upon property. Neither the right to such a process, nor the use of such a process, does, per se, import the existence of a prior lien.

2. In The St. Lawrence. the court declared the rule of 1859 prospective only in its operation. Regarding the new rule simply as the allowance of a form of remedy, this view of the prospective operation of the rule is fatal to the libellants in this case, for, before the libel was filed upon which the ship Edith was sold, her owner was adjudged a bankrupt, and an assignee appointed; and, before the rule in question was adopted, the sale had taken place, and the rights of the parties had become fixed. The petition now before us was filed, the order appealed from was made, and the present appeal was taken, before the new rule was adopted. The petitioners, in short, have taken no proceeding, either in form or substance, under the rule, and derive no benefit therefrom, if it be regarded only as a means of collecting the money due to them.

3. It may be suggested, that the supreme court, by the new rule, though it did not intend to overrule the former decisions and assert the existence of a maritime lien for supplies furnished in the home port, did intend to return to the practice which had obtained in the district courts under the rule of 1844, with the sanction of the supreme court, before the rule of 1859 was adopted; that is, that it intended to recognize the contract, as had been done before, as a maritime contract, and to enforce the lien on the vessel, if, and whenever, a lien was given for such supplies by the state law; and that so the court is made to recognize the state lien, as a right in the property, which the court of admiralty is bound to recognize in its dealing with the ship, or the proceeds of her sale.

Having concluded that the present petitioners have now no lien under the state law, this construction of the rule will avail nothing to them. But the claim to such a construction is liable to this criticism: The rule is general. It gives process in rem in all cases, without any reference to state laws, as a condition therefor. It is not to be supposed that the court intended to give the process in rem in all cases, but to make the utility of the proceeding in that form, and its efficiency as a security, to depend upon

the state law. That would again involve the subject in all the embarrassments. suggested as reasons for the rule of 1859, and call upon the United States court to deal, in the very use of its process, with the construction and effect of state laws creating liens, or claimed to do so, and with the various questions of priority which may arise under those statutes—questions with which state courts are more competent to deal.

So far as the new rule of the supreme court operates upon the subject, there seems but one alternative—1st. That rule is to be held a repudiation of the prior decisions, and an affirmative recognition of the existence of a maritime lien eo instanti supplies and repairs are furnished; or, 2d. The rule is a mere rule of practice—a rule prescribing process by which the ship can be attached or seized, and held as a security, and for the collection of the demand. In this latter view, the lien or right of detention does not arise until the process is issued, and the seizure under the process, like the levy of process of the admiralty, in the nature of a foreign attachment, where the debtor has absconded, operates upon the thing seized in the condition in which it is found, and without displacing just liens of third parties, prior in their nature. As suggested in a former part of this opinion, the court could not have intended, that, although no maritime lien exists in favor of the material man, he may nevertheless, by process in rem, obtain a priority to which he was not, as against third parties, entitled; or that, even if the state law has given him a lien, he can thereby displace liens which exist by force of the maritime law, and which, by the principles of that law, the court is bound to sustain.

It is quite true that this latter construction of the rule raises many interesting questions touching the rights of third persons, and, as the case may be, the inquiry whether, when the vessel has passed into the hands of third persons, bona fide purchasers, before such process issues, it will affect their titles. But, as already suggested, I do not deem it fitting that the circuit court should act in disregard of the repeated and consistent declarations of the supreme court, and contrary to its express decisions on the precise point, without some utterance from that court more clearly expressing an intent to overrule those decisions, than is found in this rule of court.

4. Another alternative view of the construction and effect of the new rule is suggested, namely, that, without discriminating between supplies furnished to a foreign, and supplies furnished to a domestic vessel, the rule permits the creditor to elect his form of remedy, and maintain his proceeding if he can. If, by reason of the foreign character of the vessel, or facts constituting an estoppel, or other circumstances which create or imply it, a maritime lien is established, the process in rem will be successful. But, unless a maritime lien is established, the libel in rem must be dismissed. Otherwise, the court would be deemed to create a lien by judicial legislation, when the power to do so is not conferred upon the court, either by act of congress or the constitution. To hold that the court can create such a lien, save by process which operates when the seizure is made, and not until then, as security for the debt, would be to contradict the clear declaration of Chief Justice Taney, in The St. Lawrence, 1 Black [66 U. S.], at page 529: "The process in rem, or priority, given for repairs or supplies to a domestic vessel, by the courts of admiralty, in those countries where the principles of the civil law have been adopted, form no part of the general maritime code, and no part of the admiralty and maritime jurisdiction conferred on the government of the United States." Without considering this alternative further, or the force of this constitutional objection, it confirms me in the belief that I ought not to consider a proposition open to assertion in this court, which in the supreme court has been declared at rest for nearly sixty years, and which that court has "constantly maintained." The Kalorama [supra].

It is a relief to me that the amount in controversy in this, and in some other cases involving the same questions, is sufficient to warrant a review of the decision I feel constrained to make, and it is to be hoped that we may soon have the declaration of the supreme court on the precise question, before any final injustice is done to the parties.

The fund in this case must be distributed in conformity with the decree made in the district court. As no other party appeals except the claimants for repairs and materials, no question is made here except the one which has been considered.

Let a decree be entered accordingly, with costs to the appellees.